**BILL STRONG ENTERPRISES, INC., Appellant,**

v.

**John SHANNON, Acting Secretary of the Army, Appellee.**

No. 94–1013.

United States Court of Appeals, Federal Circuit.

March 2, 1995.

Chris M. Darby, Mattox & Associates, P.C., Colorado Springs, CO, argued for appellant. With him on the brief was Judith Ward Mattox. Also on the brief was Sherman A. Botts, Lathrop & Norquist, Kansas City, MO.

John K. Lapiana, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director.

Before RICH, CLEVENGER, and SCHALL, Circuit Judges.

CLEVENGER, Circuit Judge.

Bill Strong Enterprises, Inc. (BSE) appeals from a decision of the Armed Services Board of Contract Appeals (ASBCA or Board) denying BSE's claim for recovery of consulting costs. *Bill Strong Enters., Inc.,* ASBCA Nos. 42946, 43896, 93–3 BCA ¶ 25,-961 (1993). Because the Board misconstrued the applicable regulation, we reverse and remand for further proceedings.

I

On June 18, 1987, the Department of the Army (Government) awarded BSE a fixed-price contract (Contract No. DACA27–87–C–0073) for the renovation of family housing units at Selfridge Air National Guard Base, Mt. Clemens, Michigan. By a letter dated May 26, 1988, BSE notified the Government that houses were being released to it out of sequence, resulting in increased costs of approximately "$300,000 to date" and an estimated $1,500,000 for the entire contract. In a letter to the contracting officer (CO), dated June 9, 1988, BSE requested a final decision regarding the out-of-sequence availability of houses, but the letter did not request monetary relief, nor was it certified. Subsequent

letters from the CO to BSE requested itemization of BSE's increased costs and informed BSE that an audit would be necessary.

On May 24, 1989, BSE sent the Government a letter, entitled "Claim against Government." In this letter, BSE alleged that the Government's delay in making the housing units available to BSE increased BSE's cost of performance by $520,001. BSE also alleged that, by consistently releasing the housing units out of sequence, the Government increased BSE's cost of performing the contract by an additional $52,000. In a letter dated June 6, 1989, the Government requested BSE to submit cost and pricing data with a Standard Form 1141, in accordance with Clause 71 of the contract. On June 14, 1989, BSE supplied the Government with a completed Standard Form 1141. On June 16, 1989, the Government requested the Defense Contract Audit Agency (DCAA) to audit BSE's claims, specifically, the significant discrepancy between the Government's records of the number of houses made available to BSE and the number alleged by BSE. DCAA was also asked to examine BSE's basis for determining its costs due to the out-of-sequence availability of housing units.

Renovation of all housing was completed and accepted by the Government on July 31, 1989.

On September 14, 1989, in response to DCAA's requests for specific cost data and additional information, BSE hired Excell, Inc., a consulting firm, to revise its data for resubmission to the CO. According to the contract between Excell and BSE, Excell's responsibilities were to review, analyze, and determine the technical and overall merit of issues, develop a specific proposal, and prepare a Request for an Equitable Adjustment (REA) for BSE. The contract further stated that the REA preparation effort was "undertaken with no view toward litigation.... [but was limited] to the pursuit of an administrative remedy." In a letter dated September 28, 1989, BSE notified the Government that BSE's claim needed modification and requested an "immediate abeyance" of its previously submitted May 24 claim, stating that BSE would revise its claim documents.

On November 30, 1989, BSE submitted a revised certified claim, entitled "Request for Equitable Adjustment," for a total amount of $995,568, which included the costs for delay, and included $122,336 (eventually amended to $190,248) in costs for Excell's work in preparing the submittal. On December 8, 1989, the Government requested that BSE withdraw by letter its May 24, 1989 request for a CO's final decision. The Government noted that the "Changes Clause" of the contract governs BSE's REA, and noted that the Government was assuming that BSE was not requesting a final decision at that time. In a December 13, 1989 letter, BSE withdrew its May 24, 1989 submittal.

On December 14, 1989, the Government ordered DCAA to audit BSE's November 30, 1989 claim. The DCAA audit report noted that BSE had submitted the revised claim because of DCAA's questions in its preliminary review of the May 24, 1989 claim. DCAA found that, unlike BSE's initial calculation, the calculation by Excell was based upon actual costs and employee time card records. DCAA questioned $529,572 of BSE's alleged substantive cost increase, but did not question the claimed amount for Excell's costs.

On October 26, 1990, the parties reached a settlement in which the Government agreed to pay BSE $290,000 for the delay and out-of-sequence availability costs. The settlement agreement, memorialized in Modification P00019, explicitly excluded the preparation costs BSE paid to Excell. In a memorandum of understanding, the parties agreed that the CO would issue a final decision regarding the recoverability of Excell's fees. The administrative aspects of the contract thus concluded with Modification P00019, executed one year and a half after field work under the contract was completed.

In a March 1, 1991 decision, the CO denied the recovery of Excell's costs incurred in preparing the November 30, 1989 submission. The CO found that the Government had acknowledged the shortage of unit availability and had discussed with BSE "that it recognized partial merit for the issues of lack of available units and the issuance of houses out of the specified sequence." The CO em-

phasized, however, that the Excell claim preparation was performed after the completion of the contract work and was consequently "not incurred in connection with the actual performance of the work." BSE appealed this final decision to the Board.

## II

In its appeal to the Board, BSE argued that, under the Federal Acquisition Regulations (FAR) and previous Board decisions, consultant costs are recoverable if such costs pertain to the presentation of costs arising from a performance-related claim that the Government did not dispute. Relying on *Allied Materials & Equipment Co.*, ASBCA No. 17318, 75–1 BCA ¶ 11,150 (1975), BSE asserted that its costs in hiring Excell were recoverable because they were incident to the administration and performance of the contract and were not related to the prosecution of a claim against the Government. BSE argued that, as in *Allied*, the conflict between BSE and the Government never became so "disputatious" as to reach the level of a claim against the Government, especially since BSE incurred the consultant costs to facilitate settlement negotiations.

In its brief to the Board, the Government argued that a claim against the Government existed at the time BSE hired Excell and that Excell's costs were incurred in furtherance of the prosecution of that claim. The Government emphasized that the consultant fees were incurred after contract performance was completed and, thus, argued that the costs could not be performance related.

In a 3–2 split decision, the Board affirmed the CO's decision. The majority of the Board found that, at the time of BSE's November 30, 1989 submission, the Government did dispute the amount claimed by BSE. The Board held that, under FAR 31.205–33(d) (48 C.F.R. § 31.205–33(d) (1987)[1]), BSE's consultant costs were "unallowable" because they were "incurred in the 'prosecution of claims ... against the Government.'"[2] The Board held that BSE's November 30, 1989 submission was a valid claim, according to the definition of a "claim" in FAR 33.201 and the requirements of *Dawco Construction, Inc. v. United States*, 930 F.2d 872 (Fed.Cir.1991), since a dispute between the parties existed at the time of that submission. The Board noted that BSE incurred Excell's claim preparation costs after the contract had been completed.

The majority also formulated an alternative holding in response to the dissenting members of the Board. The Board found that even if the November 30, 1989 submission did not satisfy all of the requirements of a "claim" under the Contract Disputes Act (CDA) and *Dawco*—because no dispute existed—the request was still unallowable since the requirements for "claims ... against the Government" under FAR 31.205–33 differ from the requirements for a claim necessary to establish jurisdiction under the CDA. Thus, according to the majority, BSE's con-

---

**1.** Unless otherwise specified, all citations to the FAR refer to the 1987 edition of Title 48 of the Code of Federal Regulations.

**2.** FAR 31.205–33(d) states in full:

Costs of legal, accounting, and consultant services and directly associated costs incurred in connection with organization and reorganization (see also 31.205–27), defense of antitrust suits, defense against Government claims or appeals, or the prosecution of claims or appeals against the Government (see 33.201) are unallowable (but see 31.205–47). Such costs incurred in connection with patent infringement litigation are unallowable unless otherwise provided for in the contract.

The 1987 version of FAR 31.205–47 was entitled "Defense of fraud proceedings" and is not relevant to our current case. However, FAR 31.205–47 has since been modified, and the pertinent provisions of the 1987 version of FAR 31.205–

33(d) have since been recodified in FAR 31.205–47 (now entitled "Costs related to legal and other proceedings"), specifically, FAR 31.205–47(f)(1) (making costs incurred in connection with the prosecution of claims against the Government unallowable) and FAR 31.205–47(a) (including the costs of the services of accountants and consultants in the definition of "costs"). *See,* 54 Fed.Reg. 13,022–25 (Mar. 29, 1989). However, the more general cost principles concerning the allowability of professional and consulting expenses are still found at FAR 31.205–33. *See* 55 Fed.Reg. 52,787, 52,793–94 (Dec. 21, 1990).

We emphasize that this opinion and our decision bear only upon the 1987 version of FAR 31.205–33(d). We express no opinion as to whether BSE's claim for reimbursement of Excell's costs would be allowable under the current regulations relating to such consulting costs.

sultant costs were incurred in the prosecution of a claim against the Government under FAR 31.205–33, and whether BSE had made a "claim," as defined in FAR 33.201, as of the time of the November 30, 1989 submission was irrelevant.

The dissenting members of the Board argued first that BSE and the Government had *not* reached a dispute stage at the time of the November 30, 1989 submission, but rather, were in a fact-finding stage both believed to be necessary before they could negotiate the amount due to BSE. The dissent noted that the Government never took issue with the merits of BSE's request, but simply demanded more data in order to calculate the amount that the out-of-sequence availability of houses and Government delay cost BSE. The dissent also emphasized the fact that BSE, with the consent of the Government, withdrew its May 24, 1989 request for a final decision shortly after its November 30, 1989 submission. According to the dissent, those actions by the parties were evidence that matters had not "ripened into dispute." Since negotiations regarding the amount owed to BSE had not yet begun, neither a dispute nor an impasse had arisen, and, thus, the November 30, 1989 submission was not a valid claim under the CDA, the dissent stated, citing *Dawco*, 930 F.2d at 878, and *Transamerica Insurance Corp. v. United States*, 973 F.2d 1572, 1579 (Fed.Cir.1992). The dissent concluded that BSE's consultant costs were recoverable as "necessary business costs which were not incurred in connection with the prosecution of a claim or appeal against the Government." The dissent also challenged the majority's alternative holding that the existence of a dispute is not part of the definition of a "claim" for the allowability of costs under FAR 31.205–33. According to the dissent, since the allowability of costs provision in FAR 31.205–33 references the definition of "claim" in FAR 33.201, the costs incurred by BSE could not be denied unless a "claim" under FAR 33.201 existed.

On October 10, 1993, BSE appealed the Board's decision to this court.

### III

In its briefs to this court, BSE argues that the definition of a claim for purposes of the FAR 31.205–33, the regulation concerning the allowability of consultant costs, must be the same as the definition of a "claim" for purposes of establishing jurisdiction under the CDA. BSE argues that it never satisfied the definition of a claim since it was never in dispute with the Government, but rather, the parties were in a "pre-dispute, negotiation posture." BSE suggests that if the elements defining a "claim" are not met, its consulting costs are automatically allowable under FAR 31.205–33(d). BSE's position would, if adopted, make the non-existence of a CDA "claim" the bright-line test for allowability.

In its brief to this court, the Government argues that the presence of a CDA "claim" is irrelevant to the allowability of consultant costs under FAR 31.205–33. The Government contends that such costs are allowable only if the costs benefit performance of the contract. Arguing in the alternative, the Government suggests that, if the court were to adopt BSE's bright-line test, BSE's consulting costs would still be unallowable since a dispute existed between BSE and the Government at the time BSE hired Excell, and thus, the elements of the definition of a "claim" were satisfied.

For the reasons set forth below, each party is partly right and partly wrong. BSE is right in that the meaning of the word "claim" in FAR 31.205–33(d) is the same as the meaning of "claim" in FAR 33.201. BSE is also correct when it asserts that there was no CDA "claim" in existence when Excell performed its consulting services for BSE. However, BSE's bright-line test is flawed. Consultant costs are not automatically allowable just because those costs were incurred before a CDA "claim" came into existence. On the other hand, the Government is wrong in arguing that the existence of a CDA claim is irrelevant to the allowability of consulting costs. The Government is, however, correct in saying that the Government must receive some benefit from the services of the contractor's consultant in order for the consultant's costs to be allowable.

### IV

This court's review of Board decisions is defined at 41 U.S.C. § 609(b) (1988):

[T]he decision of the agency Board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

This case turns on the interpretation of FAR 31.205–33, the regulation pertaining to the allowability of consultant costs. The Board's interpretation of this regulation is a conclusion of law, which we review *de novo* with some respect given to the Board's interpretations of applicable contract regulations because it has expertise in the area. *SMS Data Prods. Group, Inc. v. United States*, 900 F.2d 1553, 1555 (Fed.Cir.1990). Also at issue in this case is whether the Board was correct in its finding that a "claim" did exist at the time BSE hired Excell. Whether a "claim" exists is also a question of law reviewed *de novo*. *See e.g., Dawco*, 930 F.2d at 879 ("[W]e reverse the Claims Court holding that the May 21, 1984 letter was a 'claim' under the CDA as incorrect *as a matter of law*.") (emphasis added).

## A

The 1987 regulation at issue in this case resides in Part 31 of the FAR (48 C.F.R. §§ 31.000–.703 (1987)), which is entitled, "Contract Cost Principles and Procedures." FAR 31.204(a) states that "[c]osts shall be allowed to the extent they are reasonable, allocable, and determined to be allowable under 31.201, 31.202, 31.203, and 31.205." Section 31.205 is entitled "Selected costs" and contains fifty-one provisions governing the allowability of fifty-one different categories of costs. Section 31.205–33, entitled "Professional and consultant service costs," is the relevant regulation in this case. Section 31.205–33(a) states that costs of professional and consultant services are allowable, in general, subject to the exceptions in paragraphs (b), (c), (d), and (e). Section 31.205–33(d) provides that "[c]osts of legal, accounting, and consultant services . . . incurred in connection with . . . the prosecution of claims or appeals against the Government (see 33.201) are unallowable." The cross-referenced section 33.201 is in the "Disputes and Appeals" part of the FAR and defines a "claim" to mean

[a] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $50,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer . . . if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

In order to advance the interpretation of these regulations, we pause to examine their historical roots. Prior to World War II, the Treasury, War, and Navy Departments promulgated regulations classifying expenses incident to and necessary for the performance of a government contract. One of those regulations stated:

Among the items which shall not be included as a part of the cost of performing a contract or subcontract or considered *in* determining such cost, are the following: . . . legal and accounting fees in connection with . . . the prosecution of claims against the United States (including income tax matters); . . . .

T.D. 5000, 1940–2 C.B. 397, 407; *see* Robert Braucher & Covington Hardee, *Cost–Reimbursement Contracts With the United States*, 5 Stan.L.Rev. 4, 14–15 (1952). This regulation suggests an expansive scope of the phrase "claims against the United States." Then, in 1949, the Armed Services Procurement Regulations were promulgated and provided that legal, accounting, and consulting

services were allowable costs except when "incurred in connection with ... the prosecution of claims against the United States." *See* 14 Fed.Reg. 683, 684 (Feb. 16, 1949). From 1949 until 1983, the language of this regulation remained virtually unchanged. *See* 32 C.F.R. § 15.205–31 (1960); 32 C.F.R. § 15.205–31 (1983). In 1983, the Federal Acquisition Regulations were established, and these regulations adopted the same language concerning the allowability of costs of legal, accounting, and consulting services. *See* 48 Fed.Reg. 42,102, 42,322 (Sept. 19, 1983); 48 C.F.R. § 31.205–33 (1984). Also, the newly-established FAR defined, for the first time, the term "claim" as it is set out above. *See* 48 Fed.Reg. at 42,349; 48 C.F.R. § 33.001 (1984). The language in both of these regulations remained unchanged until new language was promulgated in 1986, and that language appeared in the 1987 version of the Code of Federal Regulations as FAR 31.205–33(d).

In applying the regulations of this period between 1949 and 1986, the ASBCA inconsistently interpreted the language concerning the allowability of legal, accounting, and consulting costs. On the one hand, several Board decisions denied recovery of such costs. *See, e.g., Power Equip. Corp.,* ASBCA No. 5904, 1964 BCA ¶ 4025 (1964) (contractor's legal fees were "incidental to the prosecution" of claims against the Government rather than to performance of the contract); *Owen L. Schwam Constr. Co.,* ASBCA No. 22407, 79–2 BCA ¶ 13,919, at 68,331–32 (1979) (same); *Lagnion,* ENGBCA No. 4287, 82–2 BCA ¶ 15,939, at 79,006 (1982) (same); *Ingalls Shipbuilding Div., Litton Sys., Inc.,* ASBCA No. 17717, 76–1 BCA ¶ 11,851, at 56,766 (1976) (cost of complying with Government's discovery requests was "incurred incident to the prosecution of a claim against the Government" and "not incurred in the performance of work under the contract"); *Bruce–Andersen Co.,* ASBCA No. 31663, 89–3 BCA ¶ 22,013, at 110,728 (1989) (if a consultant was hired to help build a case against the Government then costs are not recoverable, but if hired to solve problems in the

performance of the contract effort then costs are recoverable). On the other hand, a number of Board decisions permitted recovery of legal or consulting costs. *See, e.g., Lake Union Drydock Co.,* ASBCA No. 3073, 59–1 BCA ¶ 2229 (1959) (legal and consulting costs incurred in presentation of valid claims are part of cost of performance) [3]; *Allied Materials,* 75–1 BCA ¶ 11,150, at 53,087 (legal fees incurred in preparing contractor's REA were incident to contract performance because "the conflict between the parties ... never became so disputatious as to reach the level of a claim against the Government"); *Armada, Inc.,* ASBCA Nos. 27354, 27385, 84–3 BCA ¶ 17,694, at 88,242–43 (1984) (consultant costs incurred during negotiations with CO were recoverable "pre-claim" costs); *Jana, Inc.,* ASBCA No. 32447, 88–2 BCA ¶ 20,651, at 104,385 (1988) (costs were recoverable since no dispute between contractor and CO existed).

The Court of Claims also addressed the allowability of legal and consulting costs. In *Singer Co. v. United States,* 215 Ct.Cl. 281, 568 F.2d 695 (1977), the contractor sought recovery of attorney and technical consultant fees incurred in connection with the preparation and documentation of its claims for equitable adjustment that it presented to the CO. *Id.* 568 F.2d at 720. The court distinguished the *Allied Materials* decision by noting that, in *Allied Materials,* Government liability was not disputed and the REA occurred in the midstream of contract performance. *Id.* at 721. In denying recovery of the costs, the *Singer* court stated:

> [T]he claims for equitable adjustment were not presented to the contracting officer until all work had been completed, they addressed no situation in which Government liability was clear or apparent and, in content, they offered nothing that could reasonably be considered as benefiting the contract purpose. Judged both from the standpoint of the time of their submission and the purpose of their submission, [the contractor's] requests for equitable adjustment were not performance-related; they

---

**3.** The language in *Lake Union Drydock* contrary to the decision in *Power Equipment* has been overruled, but the holding in *Lake Union Drydock* still stands. *See Power Equip. Corp,* 1964 BCA ¶ 4025, at 19,814.

bore no beneficial nexus either to contract production or to contract administration. *Id.*[4] In light of these Board and court decisions, several commentators have suggested that the law regarding the allowability of legal and consulting fees in the preparation of REA's is confused and unsettled.[5]

It was within this context that Congress passed the Defense Procurement Improvement Act of 1985, Pub.L. No. 99–145, § 911, 99 Stat. 583, 682 (codified at 10 U.S.C. § 2324 (1988 & Supp. V 1993)). The Act specified that penalties would be assessed against a Government defense contractor that claimed an unallowable cost in a submitted proposal for settlement of indirect costs. 10 U.S.C. 2324(a)–(d). The Act also directed the Secretary of Defense to promulgate regulations prescribing specific categories of unallowable costs. *Id.* § 2324(e). Finally, the Act ordered the Secretary of Defense to clarify the FARs concerning the allowability and unallowability of a different set of categories of costs:

> The Secretary shall prescribe proposed regulations to amend those provisions of the Department of Defense Supplement to the Federal Acquisition Regulation dealing with the allowability of contractor costs. The amendments *shall define in detail and in specific terms those costs which are unallowable,* in whole or in part, under covered contracts. These regulations shall, at a minimum, *clarify* the costs principles applicable to contractor costs of the following:
>
> \* \* \* \* \* \*
>
> (H) Professional and consulting services, including legal services.

*Id.* § 2324(f)(1) (emphasis added).

Although the Conference Report accompanying the Act does not elaborate on the requirement to clarify the cost principles of

allowable and unallowable costs, *see* S.Rep. No. 118, 99th Cong., 1st Sess. 447–50 (1985), *reprinted in* 1985 U.S.C.C.A.N. 472, 601–04, a House Report accompanying an earlier version of the bill casts significant light on the subject. *See* H.R.Rep. No. 169, 99th Cong., 1st Sess. 11–13 (1985). That Report states:

> Although the committee expects the department to review and revise all cost principles as appropriate, 14 specific cost principles which have been the subject of numerous disputes in the past must be clarified.
>
> ... In order to eliminate ambiguity and doubt, the revised regulations are to define unallowable costs in detail and in specific terms.

*Id.* at 11–12. Congress thus instructed the Department of Defense to clarify the unsettled and confused cost principles concerning the allowability of certain costs, including legal and consulting costs, and to define the specific categories of costs that are unallowable.

In response to this congressional mandate, the Department of Defense and the General Services Administration amended the FAR. *See* 50 Fed.Reg. 51,778, 51,778 (Dec. 19, 1985) (notice of proposed rule-making). The relevant portion of FAR 31.205–33 was changed to make unallowable the costs incurred in defense against Government claims or appeals and the costs incurred in the prosecution of appeals against the Government. *See* 51 Fed.Reg. 12,296, 12,298 (Apr. 9, 1986) (final rule). According to the agencies, this change would assure consistent treatment of the costs in FAR 31.205–33. 51 Fed.Reg. at 12,298. Also, the amendment to FAR 31.205–33 added, without comment, the cross-reference "(see 33.201)" after the phrase, "the prosecution of claims or appeals against the Government." *See* 51 Fed.Reg. at 12,301.

**4.** Several more recent Court of Federal Claims decisions have followed this reasoning in *Singer* without significant comment. *See Wilner v. United States,* 23 Cl.Ct. 241, 260–61 (1991); *Gulf Contracting, Inc. v. United States,* 23 Cl.Ct. 525, 532 (1991); *Transtechnology Corp. v. United States,* 22 Cl.Ct. 349, 399–400 (1990); *Delco Elec. Corp. v. United States,* 17 Cl.Ct. 302, 333 (1989).

**5.** *See* Melvin Rishe, *Government Contract Costs* 20–16 (1st ed. 1983); 2 *Nash & Cibinic Report* ¶ 24, at 63 (Apr.1988); Richard J. Bednar, *et al., Construction Contracting* 781 (1991); John Cibinic, Jr. & Ralph C. Nash, Jr., *Cost–Reimbursement Contracting* 828 (2d ed. 1993).

■ We hold that, by referring specifically to FAR 33.201, the amended cost principle of FAR 31.205–33 recognized the word "claim" as a term of art, the meaning of which is set forth in FAR 33.201. *See, e.g., Bos'n Towing & Salvage Co.,* ASBCA No. 41357, 92–2 BCA ¶ 24,864, at 124,034 (1992). Thus, the revised regulation, in response to the congressional directive, provides for a specific, clear, bright-line test for unallowability: a legal, accounting, or consulting cost incurred in connection with the prosecution of a CDA claim or an appeal against the Government is *per se* unallowable.[6]

■ Our interpretation of the term "claim" in FAR 31.205–33 thus promotes uniformity and clarity in the FAR. Our conclusion is further supported by the fact that the revisions to FAR 31.205–33 included, for the first time, costs incurred in connection with *appeals* against the Government, which can only be brought after a contractor has made a 33.201 "claim" against the Government. Accordingly, the alternative holding in the Board's majority decision, stating that the requirements for a "claim against the Government" under FAR 31.205–33 are different from the CDA requirements for a "claim" for jurisdictional purposes, is an incorrect interpretation of the regulations.

### B

■ Our next step in analyzing FAR 31.201–33 is to interpret what is meant by "incurred in connection with the prosecution of a [CDA] claim against the Government." We note that there are at least three distinct categories of legal, accounting, and consultant costs in the contract cost principles: (1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection

with the prosecution of a CDA claim.[7] Since Congress demanded that the regulations state specifically what costs are unallowable and since the regulations only make the third category of costs unallowable, costs that fall within the first and second categories are presumptively allowable if they are also reasonable and allocable. *See* 48 C.F.R. § 31.204(a) (1987). Moreover, costs incurred in connection with contract performance or contract administration should ordinarily be recoverable because they normally "benefit[ ] the contract purpose," *see Singer,* 568 F.2d at 721, and "reimbursement of [these costs is] in the best interest of the United States." *See* H.R.Rep. No. 169, *supra,* at 12. Benefit to the contract purpose, whether in its work performance or administration, is therefore a prerequisite for allowability.

To assess allowability of a cost, the particular cost must be classified into a particular category. Costs that are incidental to contract performance are easily discernable and usually pose no problem. However, the line between costs that are incidental to contract administration and costs that are incidental to prosecution of contract claims is rather indistinct, *see* 2 *Nash & Cibinic Report, supra,* ¶ 24, at 63, and in need of clarification.

In the practical environment of government contracts, the contractor and the CO usually enter a negotiation stage after the parties recognize a problem regarding the contract. The contractor and the CO labor to settle the problem and avoid litigation. Although there is sometimes an air of adversity in the relationship between the CO and the contractor, their efforts to resolve their differences amicably reflect a mutual desire to achieve a result acceptable to both. This negotiation process often involves requests for information by the CO or Government auditors or both, and, inevitably, this exchange of information involves costs for the

---

6. We note that this holding does not pertain to consulting costs incurred in settlement of claims made when a contract is terminated for the convenience of the Government. Such situations are governed by a separate regulation and separate case law, under which such costs are generally allowable. *See* 48 C.F.R. § 31.205–42(g) (1987); *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 251, 347 F.2d 538, 544–45 (1965); *Baifield Indus.,* ASBCA No. 20006, 76–2 BCA

¶ 12,096, at 58,102–04 (1976); *see also* Rishe, *supra* note 5, at 6–57, 20–10, 20–15.

7. Tribunals that ignore the category of contract administration costs, *see, e.g., Bruce–Andersen Co.,* 89–3 BCA ¶ 22,013, at 110,728, or subsume that category into the prosecution costs category are in error. *See* 7 *The Nash & Cibinic Report,* ¶ 48, at 134–35.

contractor. These costs are contract administration costs, which should be allowable since this negotiation process benefits the Government, regardless of whether a settlement is finally reached or whether litigation eventually occurs because the availability of the process increases the likelihood of settlement without litigation. *See* 48 C.F.R. § 33.204 (1987) ("It is the Government's policy to try to resolve all contractual issues by mutual agreement at the contracting officer's level, without litigation.") Additionally, contractors would have a greater incentive to negotiate rather than litigate if these costs of contract administration were recoverable. *See* 7 *Nash & Cibinic Report, supra,* ¶ 48, at 134–35.

 In classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim, contracting officers, the Board, and courts should examine the objective reason why the contractor incurred the cost. *See Singer,* 568 F.2d at 721 (judging the "purpose" of the contractor's submission). If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205–33, even if negotiation eventually fails and a CDA claim is later submitted. *See Armada,* 84–3 BCA ¶ 17,694, at 88,242–43. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205–33.

## C

 Applying the foregoing discussion to the issues in the present case, we find that the majority opinion of the Board is flawed. First, as discussed above, the Board erred by holding that the cost principle in FAR 31.205–33 does not involve the same requirements for a claim under the CDA as set forth in this court's decisions in *Dawco* and *Transamerica.* As we held above, the definition of a "claim" under FAR 31.205–33 is the same

as the definition of a claim for purposes of establishing jurisdiction under the CDA.

Second, the Board majority also erred in concluding that BSE submitted a CDA claim. As the majority correctly states, the May 24, 1989 submission was not a formal CDA claim because the Government did not at that time dispute BSE's assertion of a right to increased compensation. Nor did the situation ever ripen into a dispute. The Government never challenged BSE's assertion of its right, and the Government had even recognized that there was "partial merit" to BSE's contention that the houses were being issued out of the specified sequence. In the time period between the May 24, 1989 submission and the November 30, 1989 submission, the parties were in a negotiation posture. The Government was conducting an audit and requested more information from BSE to help analyze BSE's request. This exchange of information is exactly what is encompassed in the concept of contract administration.

Moreover, the November 30, 1989 submission was not a formal CDA claim. We note that the November 30, 1989 submission cannot be considered a formal CDA claim since BSE did not request a final decision of the CO in the November 30 submission. Additionally, the parties had not reached a dispute stage by November 30, 1989. On September 28, 1989, prior to the November 30 submission and shortly after hiring Excell, BSE notified the Government that its "claim" needed modification and requested "an immediate abeyance [of its] previously submitted claim." Also, shortly after presenting the November 30 submission, BSE formally withdrew its May 24 submission at the Government's request. This is not the behavior of parties that are in dispute over the merits of a contractor's assertion of a right to increased compensation. Finally, the parties remained in a state of negotiation and exchange of information until the settlement of the underlying merits of BSE's request on October 26, 1990. Therefore, we hold that a formal CDA claim concerning the merits of BSE's assertion of increased compensation due to the out-of-sequence availability of houses and Government delay never arose before BSE incurred Excell's costs.[8]

8. BSE filed a certified CDA claim on November

21, 1991, requesting recovery of Excell's consul-

Third, the Board majority also erred by classifying BSE's consultant costs as costs incurred in connection with the prosecution of a CDA claim under FAR 31.205–33. Since a CDA claim did not arise before BSE incurred Excell's costs, there is a strong legal presumption that the costs incurred were not incurred in connection with the prosecution of such a claim against the Government. Since BSE and the Government were consistently in a negotiation posture and since the consultant costs were incurred as part of the exchange of information, the facts demonstrate that BSE hired Excell for the purpose of promoting contract administration and that BSE incurred Excell's costs in order to further a negotiation process that benefitted the Government. Thus, as discussed above, these costs are *not* unallowable under FAR 31.205–33.[9]

Finally, under the factual circumstances of this case, the Board majority erred in holding that the consulting costs were unallowable because they were incurred after the contract work performance was completed. First, in delay cases such as this, the contractor cannot calculate the additional expenses caused by the Government's delay until completion of the contract work. Thus, BSE's calculations prepared with Excell's assistance understandably awaited completion of the contract work. In addition, contract administration may continue, as it did in this case, after completion of contract work.

We are not, however, able simply to reverse with instructions to award BSE the contested sum. Neither the CO nor the Board made a determination regarding the reasonableness and allocability of these costs. Consequently, we remand this case with instructions to find the consultant costs allowable to the extent those costs were reasonable and allocable.[10]

V

For these reasons, the decision of the Board is reversed and the case is remanded with instructions.

*REVERSED AND REMANDED.*

No costs.

---

tant fees, which were explicitly excluded from the settlement agreement, and it was the denial of this claim on December 4, 1991, that conferred the Board and this court with jurisdiction over this appeal.

9. The costs for Excell's consulting services were incurred before the relationship of the contract parties ripened into a FAR 33.201 claim, and those costs were incurred to promote contract administration. As such they were beneficial to the achievement of the contract's purpose and therefore presumptively allowable. We emphasize that the facts of this case do not raise the question of whether such consulting costs, if incurred after a FAR 33.201 claim is made but otherwise arguably in pursuit of contract administration beneficial to the Government, are *per se* unallowable. We express no view on that question.

10. We note that at the time of the appeal to this court, BSE and Excell were engaged in litigation in state court concerning the reasonableness of Excell's fees.